UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GLORIA DENNIS and DANIEL DENNIS,

    Plaintiffs,                                          Case Number 11-13469-BC

v.                                                     Honorable Thomas L. Ludington

LUTHERAN HOMES OF MICHIGAN, INC.,

    Defendant.
_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DISMISSING PLAINTIFFS' CLAIMS WITH PREJUDICE AND CANCELING HEARING**

Plaintiff Gloria Dennis ("Gloria") began working for Defendant Lutheran Homes of Michigan, Inc. ("Defendant") in February 1997 as a Scheduler/Secretary in its Private Duty division when she was 38 years old. Her date of birth is December 20, 1958. She has been married to Plaintiff Daniel Dennis ("Daniel") since October 3, 1987. Gloria became a salaried employee for Defendant on April 1, 2006. During the 13 years of her employment, Gloria has been variously described as "scheduler/secretary"; "PD scheduler"; "PD service coordinator"; "central scheduler"; "PD coordinator" and "personal assistant."

Defendant is a non-profit corporation and the parent company of Lutheran Home Care Agency ("LHCA"). Prior to 2010, LHCA was comprised of three divisions: (1) Hospice; (2) Certified Care; and (3) Private Duty. The Private Duty division ("PS1") provided in-home personal assistance to senior citizens and disabled individuals to enable them to remain living in their homes rather than going into a nursing home or assisted care facility. The in-home care was provided by Home Health Aides ("Aides") who ran errands, assisted clients with personal hygiene, prepared meals and performed other household tasks. Defendant characterizes the scheduler position as a

stressful job because last minute changes invariably occur due to the sudden unavailability of an Aide or client requests. When such changes occurred, the scheduler has to locate other Aides willing to cover those assignments.

As the Scheduler/Secretary, Gloria's main job duty was to schedule the Aides. She continued to perform mostly scheduling until she received a lateral transfer into the payroll and accounts receivable department at her request, where she performed tasks similar to that of an office assistant. Gloria essentially worked as an office assistant. She returned to PS1 at her request some time in 2004. When Gloria returned to PS1, she received the title of Patient Care Coordinator and resumed her scheduling duties. In addition to scheduling, Gloria was responsible for opening and closing files, taking phone calls, hiring Aides, billing, payroll and handling client complaints. Gloria's job duties remained essentially the same during the rest of her time at PS1. Gloria reported directly to Lynn Maurer when she returned to PS1.

Another employee, Cynthia Owensby, performed the scheduling for PS1 from 2002 to 2004 while Gloria was assigned to the payroll and accounts receivable department. Owensby left her employment with Defendant in 2004, but returned in 2006 and assisted Gloria with scheduling until Gloria became the scheduler at PS2 in 2010. According to Defendant, Owensby was trained to be a scheduler by Michelle Erdman in 2002 when she first began performing scheduling work. Gloria, however, contends that in 2010 she began training Owensby to be a scheduler and was unaware that Owensby was interested in pursuing a scheduling position.

During her time as the scheduler, Gloria received some complaints her about her job performance from co-workers who told her they felt she was "not fair" and was "picking on them." Gloria's performance evaluations from 2004 through 2008 reflected that a number of performance

-2-

deficiencies were brought to her attention that she never corrected and for which she was never disciplined. More specifically, Gloria's March 26, 2004 performance evaluation that her supervisor, Lynn Maurer, prepared indicated that Gloria was asked to share the information she learned from attending monthly meetings with the Michigan Home Health Association ("MHHA") with the individuals who attended the PS 1 monthly meetings and to speak-up more at those meetings. Gloria testified at her deposition that Maurer told her that she was not meeting her directive regarding sharing that information. Gloria Dep. at 37. Maurer also noted that Gloria had shared information with the staff at the monthly PS1 meeting that would have been more appropriate to discuss in private.

    Notwithstanding the fact that she was advised in her 2004 performance evaluation that she needed to share the information she obtained at the MHHA meetings, the June 28, 2005 performance evaluation Maurer prepared reflected that Gloria only shared the needed information when she was specifically asked to do so. Gloria's 2005 evaluation also reflected that she still "doesn't have a lot to say in the meetings [and] needs to participate more in the meetings." ECF No. 12 Ex. 9. It further reflected that Gloria needed to minimize the amount of overtime the Aides were working due to the strain it placed on PS1. Gloria testified that overtime was caused by not having enough Aides, but it was also part of Gloria's job duties to hire the necessary Aides. Gloria Dep. 72-74. Moreover, Maurer noted in the evaluation that she was hopeful that giving Gloria her own office would resolve some of the issues she was having with the private duty case manager. The evaluation also noted that Gloria did not compose a job description Maurer asked her to prepare. Gloria completed another self evaluation at that time explaining that she needed to timely perform the evaluations of the Aides and keep up with the chart closings. ECF No. 12 Ex. 10.

Maurer prepared Gloria's 2006 evaluation and noted that Gloria had not provided copies of the minutes from the MHHA meetings Gloria attended despite being informed during the 2005 evaluation that she was required to prepare and present the minutes at the PS1 monthly meetings. Maurer reminded her again that "[i]t is important that we share what we learn from these association meetings" ECF No. 12 Ex. 11. Finally, Maurer told Gloria that she wanted her to attend private duty conferences and prepare a plan for presenting minutes from the MHHA. Gloria only attended one such conference after that evaluation was prepared and was unable to recall any ideas she brought back to PS1 to help it improve its operations. Gloria Dep. 46-47. In addition, Gloria was unable to recall preparing a plan for presenting minutes from the MHHA. Gloria Dep. at 49.

Notwithstanding the requirements expressed in her previous evaluations, the March 2007 evaluation Maurer prepared noted that Gloria had still not provided the requested MHHA updates and that she still gave oral reports only when asked specifically to do so. ECF No. 12 Ex. 12. Maurer also noted that Gloria was not forthcoming with ideas of her own to help improve PS1. *Id.*

Gloria also continued to have issues regarding the manner in which she treated the Aides. Gloria acknowledged that some aides told her that they believed she was a supervisor in a "punitive way." Gloria Dep. 51. Maurer advised Gloria that she needed to be less frustrated in her communications with the Aides, to which Gloria replied that "she wasn't the warm fuzzy type but more by the book business type." Gloria Dep. at 51-53, ECF No. 12 Ex. 12. Gloria testified that she never proposed any ideas for Defendant to accomplish its goal of expanding PS1 into additional areas beyond having "approximately 30 aides and servicing a 50-mile radius around Frankenmuth." Gloria Dep. at 53-54. On February 15, 2008, Gloria completed an Employee Satisfaction Survey that asked what changes she would make to her job if she could. ECF No. 12 Ex. 13. Gloria responded

that hav[ing] a scheduler so I wouldn't have to do that part. I am burnt out on scheduling" and "I just need a change of some kind." *Id.*

In April 2008, Gloria received a performance evaluation that was prepared by Monique Bonkowski, who noted that Gloria was not sharing the information she received from MHHA with PS1 on a regular basis and that sharing that information was vital to the growth of PS1. ECF No. 12 Ex. 14. Bonkowski also noted that Gloria needed to share ideas with PS1. *Id.* Additionally, Bonkowski noted that "[i]t is important for Gloria to utilize software training and continue moving forward in these processes. Scheduling will require adaptability to new technology and flexibility will be crucial." *Id.* Gloria did not learn how to use the new software for scheduling. Gloria Dep. 63.

In January 2009, Jon Golm, age 40, was hired as the Director of Service Development. When Golm[1] was first hired, he did not anticipate a restructuring of PS1. ECF No. 12 Ex. 15. After studying PS1 for a period of time, Golm introduced the concept to Lynn Zuellig, Defendant's Chief Operating Officer, age 59, of forming PS2 as a separate entity in an attempt to grow the private duty business from a 50 mile radius around Frankenmuth to statewide. PS1 had been unable to grow during the time it had been in business and, therefore, in order for PS2 to meet its goal of increasing the number of service hours from 1,500 to 15,000 per month, PS2 was going to operate under a new business model with new employees. Janet Hausbeck, age 48, was hired in September 2009 to coordinate the opening of PS2's new branches and implement PS2's new processes at each branch.

---

[1] Gloria notes that Golm's new management style created additional stress and that a number of the female employees were brought to tears after interacting with him. It is unclear if Gloria is attempting to assert a gender discrimination claim, but if so, this claim is not plead in the complaint and thus not before the Court.

Gloria attended management meetings in 2009 where the formation of PS2 was discussed. In December 2009, a group meeting was held whereby the formation of PS2 was announced to all of PS1's employees. The employees were informed about PS2's goals and the fact that it would be a separate entity. *Id.* PS1's office employees were informed that they must apply for a position at PS2 because they were essentially starting new employment.

Based on her previous performance issues, her stated burnout on scheduling and the fact that the scheduler position at PS2 was going to be more stressful, fast paced, have more accountability and more responsibility than the PS1 scheduler, Golm and Hausbeck spoke to Gloria on January 8, 2010 to make sure she understood the requirements of the new job and their concerns that she may not be able to meet them. In addition to scheduling, the PS2 scheduler was going to be responsible for parts of billing, payroll, time keeping and learning new software. ECF No. 12 Ex. 15. Gloria was given a written description of the expectations of the PS2 scheduler job that she signed. ECF No. 12 Ex. 18. Those expectations included: (a) having an "entrepreneurial spirit"; (b) being "capable of multi-tasking"; (c) "proactively look[ing] at other businesses in the industry for new ideas and improvements"; (d) taking "full ownership of scheduling"; (e) "proactively recommend[ing] changes that will scale us to 15,000 hours"; and (f) recommending changes that would improve the scheduler position and make it more efficient. ECF No. 12 Ex. 18. Gloria was also told there would be a 60-day integration trial period at PS2 starting in February 2010. *Id.*

Notwithstanding their concerns about Gloria's ability to meet the requirements of the position and the fact that Cynthia Owensby also applied for the PS2 scheduler position, Golm and Hausbeck selected Gloria for that job. ECF No. 12 Ex. 17. Owensby was selected instead to be part of PS2's growth team where she did not perform any scheduling of the Aides. Hausbeck became

Gloria's supervisor when Gloria accepted the PS2 scheduler position. Gloria was the eldest of the other member's of PS2's administrative staff.

Shortly after Gloria began working as the PS2 scheduler, she began having performance deficiencies. Gloria believes these deficiencies are due, at least in part, to what she perceived as a stressful and hostile work environment under Golm's management. On February 16, 2010, a client contacted PS2 to express frustration regarding the way Gloria handled a request she had made. ECF No. 12 Ex. 19. The client complained that Gloria led her to believe that Gloria would contact her Aide, who was running errands for that client, to advise her to pick up some additional items that the client needed. *Id.* Gloria was counseled that she should have instead told the client that she had no way of contacting the Aide because not every Aide has a cell phone and Defendant's policy requires those that do to turn them off during work hours. *Id.* Had she done so, the client's frustration would have been prevented. *Id.*

On February 17, 2010, an Aide with no disciplinary history, Tina Benkert, contacted Hausbeck to discuss PS2's new personal service policy. ECF No. 12 Ex. 20. Benkert told Hausbeck that she asked Gloria to take her off the schedule on March 5, 2010 because her daughter had been diagnosed with a large mass in her throat and Benkert needed to take her daughter to see a pediatric surgeon on that date. *Id.* Benkert further told Hausbeck that before Gloria eventually agreed to give her that day off, Gloria told Benkert that she was "working" on the schedules, that Benkert should have provided more notice, and that Benkert's conduct was unacceptable at PS2. *Id.* Gloria was counseled that Benkert's situation was an exception to the rule and that Gloria needed to show more compassion and better judgment in such situations. *Id.*

That same day, another Aide, Sue Davidson, came forward with a complaint that Gloria was

harassing her. ECF No. 12 Ex. 21. Davidson asked for her scheduled start time with a private duty client to be changed to allow her to accommodate a hospice client, but Gloria told her that she did not want to change the schedule that had already been inputted into the computer. *Id.* Davidson indicated that the private duty client had approved her request and did not do well in Davidson's absence. Davidson's private duty client's son had called just prior to Davidson's complaint to complain that he did not want his mother removed from Davison's care because his mother suffered from dementia, had bonded with Davidson, and needed a stable care-giver schedule. He advised that he would use another company if Davidson was not the Aide assigned to his mother's case and noted that it was the third time in 7-8 months that he had called to complain about Gloria. ECF No. 12 Ex. 22.

On March 19, 2010, Hausbeck counseled Gloria regarding a number of additional performance concerns that had occurred since February 17, 2010. ECF No. 12 Ex. 23. Specifically, Hausbeck counseled Gloria that she acted inappropriately when she declined to offer services to a potential client seeking 24-hour hospice on February 25, 2010 without offering to accommodate any hours. *Id.* Hausbeck also counseled Gloria about her decision to refuse to provide assistance to a client who drove from Saginaw to Frankenmuth on March 4, 2010 to pick-up paperwork. ECF No. 12 Ex. 23. Gloria was told that the needs of the client came first, regardless of whether it was inconvenient for her. *Id.* Hausbeck also met with Gloria on March 12, 2010 to discuss the quality of Gloria's work and timeliness of her assignments. ECF No. 12 Ex. 23; Ex. 24. Hausbeck advised Gloria that she was not meeting performance standards and was not producing the level of work required. *Id.* Gloria admitted that she performed better when she was told exactly what needed to be done; however, she was advised that her position required more strategic, proactive decision

making skills, which she was not demonstrating. *Id.* As a result, the project she was working on was reassigned and her responsibilities were reduced.

Hausbeck also counseled Gloria about the fact that comments were received from various Aides that they would call the on-call schedulers rather than call during office hours because Gloria was difficult to deal with, was "snippy," and had an attitude. ECF No. 12 Ex. 23. Hausbeck noted that Gloria's performance was best suited for routine, structured assignments that could be checked off a list—an observation Gloria agreed with ECF No. 12 Ex. 24.

On April 9, 2010, Hausbeck met with Gloria again to discuss additional performance deficiencies that arose. ECF No. 21 Ex. 25. Hausbeck first noted that Gloria failed to take full ownership of scheduling as required for the PS2 scheduler because: (a) they received further complaints from the son of the client who previously complained on February 17, 2010 about the frequency of aide changes for his mother; (b) Gloria failed to make suggestions to improve the scheduling process; (c) Gloria failed to provide requested data, leaving management to make many decisions based on "best guesses"; (d) Gloria failed to tabulate and summarize the results of recent "Availability Forms"; and (e) Gloria failed to perform her scheduling duties efficiently, thereby causing PS2 to incur overtime costs. ECF No. 12 Ex. 25. Gloria was unable to identify the cause of the overtime problem or offer any suggestions on how to improve it. *Id.* Hausbeck's second area of concern was Gloria not providing information Hausbeck had requested. ECF No. 12 Ex. 25. Specifically, Gloria did not create a log showing the number of and reasons for the calls she made and received and she did not identify her "Big Rocks" by the deadline Hausbeck had given to the staff. *Id.* Hausbeck's third area of concern involved Gloria's ability to expand her scheduling responsibilities to the additional branches that were slated to be opened in July and September 2010.

*Id.*

Gloria was relieved of numerous responsibilities-including learning new scheduling software, client billing and Aide management-to allow her to focus solely upon her scheduling duties. ECF No. 12 Ex. 15; Ex. 25. However, her ownership and management of scheduling did not improve. ECF No. 12 Ex. 25. Hausbeck advised Gloria that the primary objective of the PS2 scheduler was to fill all client requests with minimal or no overtime, which required innovative and independent thinking. *Id.* Gloria had not been meeting that primary objective and did not demonstrate any concern or suggest any measures to address the overtime issue. *Id.*

Based on the performance issues Gloria was having, Golm and Hausbeck recommended to Zuellig that Gloria's employment be terminated. Golm and Hausbeck indicated that it became evident that Gloria would be unable to fulfill the requirements of the PS2 scheduling position once the position demanded scheduling 5,000 to 12,000 hours per month when she was having difficulty scheduling 2,000 hours per month. After reviewing the performance evaluations, Zuellig approved their decision to terminate Gloria's employment. ECF No. 12 Ex. 26. At the time her employment was terminated, Gloria was 51 years old.

Plaintiffs then filed a complaint with the Circuit Court for the County of Saginaw, which Defendant removed to this Court on August 10, 2011. Gloria alleges a claim for age discrimination in violation of the Age Discrimination in Employment Act and her husband, Daniel, alleges a loss of consortium claim. Defendant filed a motion for summary judgment, seeking dismissal of Plaintiff's ADEA claim for failure to establish a prima facie case or, in the alternative, because Defendant has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment. Defendant also seeks dismissal of Daniel's loss of consortium claim because it is

derivative of Gloria's ADEA claim. For the reasons provided herein, Defendant's motion for summary judgment will be granted and Plaintiffs' motion to file a sur-reply will be denied.

## I. Standard of Review

A motion for summary judgment should be granted if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be proven or is genuinely disputed must support the assertion by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). The party seeking summary judgment has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If the opposing party fails to raise genuine issues of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. *Anderson*, 477 U.S. at 250.

The court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d

1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## II. Discussion

### A. Gloria's ADEA Claim

The ADEA prohibits an employer from failing or refusing to hire, discharging, or discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1). To establish a claim under the ADEA, a plaintiff may either produce direct evidence of age discrimination, or rely upon circumstantial evidence that would permit an inference of discrimination under the burden-shifting method of *McConnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 510 (6th Cir. 2004). Direct evidence is that which, if believed, "requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Rodriguez v. FedEx Freight E., Inc.*, 487 F.3d 1001, 1007 (6th Cir. 2007) (citation and quotation omitted). "Direct evidence of discrimination does not require the factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice among members of the protected group." *Id.* "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow the factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 405, 410 (6th Cir. 2008). With both direct and circumstantial evidence, the burden of persuasion remains on the plaintiff to show that "age was the 'but for' cause of their employer's

adverse action." *Gross v. FBL Fin. Servs., Inc.*, --- U.S. ---, 129 S. Ct. 2343, 2351 n.4 (2009).

Because Gloria does not allege that she has direct evidence of the alleged discrimination, the question becomes whether she is able to establish a prima facie case of discrimination through circumstantial evidence. *Coomer*, 370 F.3d at 510. A plaintiff successfully establishes a prima facie case under the *McDonnell Douglas* test when he produces "evidence that: (1) she was at least 40 years old at the time of the alleged discrimination; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) she was replaced by a younger person." *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992).[2] Defendant does not challenge Gloria's ability to satisfy the first or second prongs of the *McDonnell Douglas* test but argues that Gloria is unable to satisfy the third and fourth prongs of her prima facie case.

### 1.   Qualified for the Position

Defendant first argues that Gloria is unable to establish a prima facie case of wrongful termination based on age discrimination because it was well-documented that she was unable to meet the expectations of her position as a PS2 scheduler. *See Ang v. Procter Gamble*, 932 F.2d 540 (6th Cir. 1991) (a plaintiff may be unqualified because of her failure to meet a supervisor's legitimate expectations, which were noted in a performance review); *McDonald v. Union Camp Co.*, 898 F.2d 1155 (6th Cir. 1990) (plaintiff failed to establish that he was performing at level that met his employer's legitimate expectations where he conceded that his employer was dissatisfied with his work); *see also Jacklyn v. Schering-Plough Healthcare*, 176 F.3d 921 (6th Cir. 1999) (plaintiff could not establish she was meeting her employer's legitimate expectations where she failed to

---

[2]Gloria's response includes the legal standard for an ADEA disparate treatment claim. The complaint, however, pleads an ADEA wrongful termination claim and a disparate treatment claim is not currently before the Court.

comply with mandatory changes in sales methods).

Gloria urges the Court to look to her objective qualifications, independent of the reasons offered for her employment being terminated. *See Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 575 (6th Cir. 2003) ("At the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job. . . . Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills."); *Cicero v. Borg-Warner*, 280 F.3d 579 (6th Cir. 2002) (explaining that the trial court must evaluate whether a plaintiff has established his qualification independent of the employer's proffered nondiscriminatory reasons for discharge). Gloria submits that, at the prima facie stage, all that is required is that she demonstrate that she was qualified for the position, and not that she was otherwise performing satisfactorily.

Gloria offers her own affidavit that she contends outlines her qualifications for the scheduler position. However, "self-serving affidavits without factual support in the record will not defeat a motion for summary judgment." *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir.2001) (citation omitted); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995). All of the statements which Gloria presumably contends outlines her qualifications relate to her performance and salary increases as a scheduler for PS1 and does not address how this establishes that she was qualified for her position as the scheduler for PS2— a position which included significantly more job responsibilities.

Gloria also contends that the fact that she was offered the PS2 scheduler position instead of Owensby, who also applied for the position, is evidence that she was qualified for the position.

Gloria does not explain why she believes Defendant's earlier decision to hire her in lieu of another employee addresses her later performance or otherwise satisfies the third element of a prima facie case that Gloria was either objectively or subjectively qualified for the position.

Plaintiff also requests that the Court review the affidavits, depositions, and documents attached to her response that may include evidence that she meets the qualification prong of a prima facie case but does not otherwise identify what additional evidence is present to establish that she was qualified for the PS2 scheduler position. It is well-established that the burden is on a discrimination plaintiff to establish a prima facie case of discrimination. *See Lautermilch v. Findlay City Schools*, 314 F.3d 271, 275 (6th Cir. 2003). "[T]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). Plaintiff does not identify specific facts in the record to support her general contention that she was qualified for her position. Defendant's motion for summary will be granted.

### 2. Replaced by a Younger Person

Alternatively, Defendant contends that Gloria cannot demonstrate that she was replaced by a younger person. Under the ADEA, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. *Lilley v. BTM*, 958 F.2d 746, 752 (6th Cir. 1992); *Barnes v. GenCom, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). Here, Gloria testified that

her job duties were distributed among three existing employees—Cynthia Owensby, Shelley Daenzer and Vicki Parrish. Gloria Dep. 130-32. Owensby assumed Gloria's scheduling duties, Daenzer assumed her billing and payroll duties, and Parrish assumed her case manager duties in addition to their existing duties. *Id.*; ECF No. 12 Ex. 17. Defendant argues that such a showing does not constitute being "replaced" as a matter of law. *See Lilley*, 958 F.2d at 752; *Barnes*, 896 F.2d at 1465.

Gloria alleges in her response that she was replaced by Owensby and that her supervisor was aware that Owensby was attempting to "push[] Gloria out of her job." ECF No. 14 at 23. The response does not address Defendant's contention, or Gloria's acknowledgment, that her duties were instead redistributed to three other employees.

The case law proffered by Defendant, however, provides that a plaintiff is not replaced in the context of a reduction in workforce where the work is redistributed among other existing employees already performing related work. *See Lilley*, 958 F.2d at 752; *Barnes*, 896 F.2d at 1465. Defendant's contention is thus inapplicable to the instant case. Plaintiff's employment was not terminated in the context of a reduction in workforce. As Defendant concedes, Gloria's responsibilities were distributed among three younger, existing employees. She was thus replaced by individuals outside the protected class.

### 3.     Defendant's Legitimate, Non-Discriminatory Reason for Terminating Gloria's Employment

Even if Gloria were able to establish a prima facie case of age discrimination, Defendant argues that dismissal of her claim is still warranted because it had legitimate, non-discriminatory reasons for terminating her employment based on her poor job performance that Gloria cannot establish are pretextual.

It is well-established that "[p]oor performance is a legitimate non-discriminatory reason for terminating an employee." *Stockman v. Oakcrest Dental Ctr.*, 480 F.3d 791, 802 (6th Cir. 2007). Furthermore, "[a]n employee's opinion that he did not perform poorly is irrelevant to establishing pretext where the employer reasonably relied on specific facts before it indicating that the employee's performance was poor." *Id.*; *Arendale v. City of Memphis*, 519 F.3d 587, 2008 WL 731226, * 15 (6th Cir. 2008) ("Conclusory assertions supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment"). Finally, once the burden shifts back to Plaintiff to demonstrate pretext, she must show that the employer did not reasonably rely on "particularized facts that were before it at the time the decision was made." *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 713-14 (6th Cir. 2007).

Gloria requests the opportunity to demonstrate to a jury that Defendant's proffered reasons for her termination are pretextual and untrue. She does not, however, address the evidence advanced by Defendant. Defendant has produced extensive documented instances of Gloria's poor job performance on which it relied in deciding to terminate her employment. The fact that Gloria may believe that she was not performing her job poorly alone does not address whether Defendant's reasons for her termination were pretextual.

### B. Daniel's Loss of Consortium Claim

Defendant also contends that Daniel's claim of loss of consortium is wholly derivative of Gloria's age discrimination claim. Because Gloria's claim should be dismissed, Defendant argues that Daniel's claim against Defendant is also deficient as a matter of law and must be dismissed. *See Wilson v. Alpena Rd. Comm.*, 474 Mich. 161 (2006); *Berryman v. KMart Corp.*, 193 Mich. App. 88 (1992). Because Gloria's age discrimination claim will be dismissed, Daniel's derivative loss of

consortium claim must be dismissed as well.

### C. Plaintiffs' Motion to File a Sur-Reply

Plaintiffs have filed a motion to file an eleven page sur-reply, and contend that Defendant's reply contains new legal issues and factual claims. A review of Defendant's reply does not reflect any new arguments; indeed, Defendant's reply is just that—a reply to Plaintiffs' arguments in their response. Plaintiffs' motion to file a sur-reply will thus be denied. *See Flynn v. Veazey Construction Corp.*, 310 F. Supp. 2d 186, 189 (D.D.C.2004) ("[T]he decision to grant or deny leave to file a sur-reply is committed to the sound discretion of the court.").

### III. Conclusion

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment (ECF No. 12) is **GRANTED**.

It is further **ORDERED** that Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Plaintiffs' motion to file a sur-reply (ECF No. 20) is **DENIED**.

It is further **ORDERED** that the hearing scheduled for July 30, 2012 is **CANCELED** because oral argument will not aid in the disposition of the motion. E.D. Mich. L.R. 7.1(f)(2).

                                              s/Thomas L. Ludington
                                              THOMAS L. LUDINGTON
                                              United States District Judge

Dated: July 31, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 31, 2012.

                              s/Tracy A. Jacobs
                              TRACY A. JACOBS